UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| TOMMY BLAIR, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Nos. 2:11-CR-3 |
| ) | 2:15-CV-14 |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

Tommy Blair ("Petitioner") has filed a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. §2255, [Doc. 205], and a proposed amendment thereto, [Doc. 207]. For the reasons discussed in this Memorandum and Order, both his motion and the proposed amendment are DENIED.

### I. BACKGROUND

Petitioner, Samuel Clark, and Christina Rogers were indicted for their respective roles in defrauding TruPoint Bank ("Bank") so that Clark could obtain a loan to finance his purchase of several business properties from Blair. Rogers was Clark's mortgage broker whose responsibility was to find a bank willing to make a loan to Clark. The facts are set out in the opinion of the Sixth Circuit Court of Appeals:

> In 2005, Samuel Clark expressed interest in purchasing several car wash businesses and a laundromat from Tommy Blair. Clark told his mortgage broker, Christina Rogers, that he would need a loan to finance the entire purchase and to provide him with surplus cash to use as operating funds for the businesses. Because no bank would approve such a loan, Rogers devised a fraudulent plan, to which Clark and Blair agreed, that involved inflating the value and purchase price of the transaction so that the bank would approve a loan amount greater than the actual purchase price. Blair agreed to sell his businesses to Clark for $3.4 million. On the bank loan application, however, Rogers inflated the purchase price to $4.2 million so that the bank would approve a loan in excess of the actual purchase price. Blair agreed that he would return $125,000 of the proceeds from the sale back to Clark as operating cash for the businesses upon receiving a check

from the bank, and Clark agreed that he would reimburse Blair for any additional capital-gains taxes incurred as a result of the difference between the actual purchase price of $3.4 million and the $4.2 million price reported on the loan documents. In addition, Blair submitted falsified tax information (a "Schedule C" form) that overstated the income generated by his businesses so that the bank would conclude that the loan transaction was a safe investment. Based on that information, which Rogers submitted to TruPoint Bank, Clark was approved for a loan to finance 85% of the inflated $4.2 million purchase price—a total loan of $3.57 million.

The false information on the loan documents was submitted along with fake checks and a false promissory note, signed by Blair and Clark, and notarized by Rogers, indicating that Clark had made a down payment of 10% of the total purchase price to Blair, and that Blair had agreed to provide seller financing to cover the remaining 5% of the purchase price. At trial, however, Clark testified that he had never actually made any of those payments to Blair and that the purported seller-financing agreement was also part of the sham, designed to deceive the bank so it would provide a loan in excess of the actual $3.4 million purchase price.

After the loan closed in April 2006, Blair received a check for the net proceeds of the sale and issued a check to Clark for approximately $125,000, the difference between the actual purchase price and the amount they had obtained from the bank, less closing costs and $17,650 in fees that Rogers claimed for brokering the fraudulent transaction. Thereafter, Clark made only one of the $30,000 monthly payments on the loan. When Blair learned that Clark had stopped making payments on the loan and began to suspect that Clark might not fulfill his earlier promise to repay Blair's capital gains taxes, Blair decided to come clean about the irregularities in the loan transaction.

In January 2011, a federal grand jury charged Blair, Clark, and Rogers with bank fraud, in violation of 18 U.S.C. § 1344, conspiracy to commit bank fraud, in violation of 18 U.S.C. §1349, and submission of materially false statements to TruPoint Bank, in violation of 18 U.S.C. § 1014. Clark eventually pleaded guilty to a single count of conspiracy to commit bank fraud, 18U.S.C. §1349, pursuant to a plea agreement in which he agreed to testify against Blair and Rogers at trial.

At trial, TruPoint Bank official Cameron Forrester testified that Blair called him on August 1, 2006, to inform him that Clark would likely default on the loan. Blair then sent a letter to Forrester, informing him of the $125,000 check he had issued to Clark after the closing. In the following weeks, Blair confessed to Forrester that the checks for the down payment amounts had been forgeries and that the purchase price in the settlement statement had been inflated from $3.4million to $4.2 million. Blair also sent Forrester a copy of the real" contract between Clark and Blair, which listed a purchase amount of $3.4 million. Around the same time, Blair recorded a phone conversation with Clark, during which they referred to all three defendants' roles in orchestrating the fraud.

At trial, FBI agents testified that Blair walked into an FBI office on September 18, 2006, and asked to speak with them about the fraudulent transaction. Blair allegedly explained the fraud to them that day and revealed additional details throughout the subsequent investigation. The evidence at trial also included the recording of the phone call between Clark and Blair, which Blair eventually turned over to the FBI in an effort to minimize the appearance of his role in the conspiracy. In addition, the trial evidence included the "real" contract wherein Clark and Blair had agreed to the actual sale price of

$3.4 million, the falsified Schedule C form, and documents in which Blair had falsely confirmed that Clark paid him a down payment. Blair did not testify at trial. Rogers testified in her own defense, but her testimony actually supported the Government's case by revealing that she had been aware of Clark's personal finances and presumably knew that he could not make the requisite down payment to qualify for the loan she helped broker.

The jury found both Blair and Rogers guilty of bank fraud and conspiracy to commit bank fraud. Blair was also convicted of making materially false statements to TruPoint Bank, and Rogers was convicted of making materially false statements to the FBI. Both were sentenced to 46 months' imprisonment and ordered to repay $1,443,775.73 in restitution to TruPoint Bank. [1]

## II. STANDARD OF REVIEW

This Court must vacate and set aside petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ." 28 U.S.C. § 2255. Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief. If it plainly appears the movant is not entitled to relief, the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted). A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson,* 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). See also *United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court

---

[1] Doc. 199.

3

lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th Cir.), cert. denied, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States,* 72 F. 3d 503, 506 (6th Cir.), cert. denied, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

When a § 2255 Petitioner claims he was denied his sixth amendment right to effective assistance of counsel, it is noted that an attorney is presumed to have provided effective assistance, and the Petitioner bears the burden of showing that the attorney did not, *Mason v. Mitchell*, 320 F.3d 604, 616-17 (6th Cir. 2003). Petitioner must prove that specific acts or omissions by his attorney were deficient and that the attorney failed to provide "reasonably effective assistance," *Strickland v. Washington*, 466 U.S. 668, 687 (1987), which is measured by "prevailing professional norms," *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). "[T]he constitutional right at issue here is ultimately the right to a fair trial, not to perfect representation." *Smith v. Mitchell*, 348 F.3d. 177, 201 (6th. Cir, 2003 (citing *Strickland*). If Petitioner crosses this evidentiary hurdle, he must then show "a reasonable probability that, but for [the attorney's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. In other words, he must show that he was actually prejudiced by the attorney's deficient representation:

> To succeed on an ineffective assistance claim, a defendant must show that counsel's deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). [A court's ] review of counsel's performance is "highly deferential." *Id*. at 689, 104 S.Ct. 2052. [The court must] "judge the reasonableness of the time of counsel's conduct." *Id*. at 690, 104 S.Ct. 2052. The defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* To establish "prejudice," a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694, 104 S.Ct. 2052. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S.86, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011). And, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

*Docherty v. United States*, 536 Fed. Appx. 547, 551 (6th. Cir. 2013).

### III. PETITIONER'S MOTION, DOC. 205

#### A. Ground One: Ineffective Assistance of Counsel

Petitioner claims that his lawyers provided ineffective assistance by refusing to obtain a handwriting analysis to show that his signatures on three documents submitted to the bank in support of the loan application--two offers to purchase and a lease agreement with a business tenant--were forged by either Daniel Mitchell, whom petitioner retained to find a buyer for his businesses, or Sam Clark. [2] He argues that it is not his signature on these documents and that a handwriting expert has so confirmed after the trial. [3] In the same vein, he argues that his attorneys were ineffective in failing to call Mitchell and Danny Pollito (who assisted Clark in creating and submitting to the bank three fake cashier's checks intended to show that Clark made the required down-payment to petitioner) [4] in an effort to prove that one of them signed petitioner's name to the documents.

Petitioner's attorneys did well to refrain from hiring a handwriting expert in an attempt to show that someone other than petitioner signed his name to the three documents; it would have been a waste of time and very likely counter-productive. Regardless of who signed his name to the offers to purchase, petitioner never repudiated them, choosing rather to allow the documents to be furnished to the bank as part of Clark's application for a loan. Similarly, he never repudiated the lease agreement with his tenant.

For the same reason, the court cannot second-guess petitioner's attorneys for failing to call Mitchell or Pollito as witnesses. Nothing of any evidentiary value would have been accomplished in light of the fact that petitioner never disowned the documents and allowed them to be submitted to the bank. The same can be said for counsel's failure to quiz Clark during cross-examination about who actually signed petitioner's name to the documents.

Failure to obtain an analysis of the handwriting on the documents, failure to call Mitchell or Pollito as witnesses, and failure to cross-examine Clark about the signatures, was not prejudicial.

Petitioner next faults his attorneys for failing "to inform the Districk Attorney (sic)" before David Harris, the appraiser retained by the bank to evaluate the properties to be purchased from

---

[2] Doc. 143 at 18
[3] Doc. 205-1
[4] Doc. 111 at 137-147

petitioner by Clark, was to testify. Whatever petitioner intends to convey by this sentence is unclear. The sentences which follow suggest that Harris' testimony regarding certain events would have contradicted Cameron Forrester's testimony.

If he is claiming that his attorneys were ineffective for failing to notify the Assistant United States Attorney (of something) before Harris was called as a witness, petitioner's claim is without merit. There is no legal requirement that they should have done so, and it would have accomplished nothing. If he is claiming that they should have called Harris as a witness but failed to do so, he misstates the facts. His attorneys called Harris as a witness and elicited testimony from him that contradicted Forrester is some respects. [5]

Neither interpretation of petitioner's claim regarding Harris provides a basis to find that his attorneys were ineffective.

Petitioner claims that his attorneys were ineffective because they failed to question his co-conspirator, Tina Rogers, about the first time they met, apparently arguing that the timing of that first meeting negated any possible conspiracy between them. The problem with this claim is that his attorneys did cross-examine Rogers and questioned her regarding the date of their first and subsequent meetings. [6]

### B. Ground Two: Violation of petitioner's privilege against self-incrimination

As he recites in his motion, when petitioner talked to the FBI agents, he told them that he scanned a copy of Schedule C to his 2005 income tax return and then created another version of it that reflected a higher (and quite false) gross income generated by the properties he was selling to Clark. The bank, it will be recalled, had requested a copy of the 2005 Schedule C in support of the loan application. He now says that his statement to the FBI agents that he created the fake Schedule C was a lie; that the fake version of the document was created by an "aide" to his CPA; and that he lied to protect his CPA. He says that his statement to the FBI was the "key evidence" used to convict him of bank fraud, and admitting it into evidence was a violation of his constitutional right against self-incrimination.

Putting aside the almost-total absence of logic to petitioner's assertion that he falsely implicated himself to protect his CPA, there was no constitutional violation. A potential Fifth

---

[5] Doc. 179 at 36-40
[6] Doc. 143 at 35, 42-43

Amendment privilege against self-incrimination would have been triggered only if petitioner had been in custody or its functional equivalent, *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980). It was petitioner who contacted the FBI, appearing unannounced at its offices in Johnson City on September 18, 2006, [7] at which time he provided the agents with their first knowledge of the fraud perpetrated on the bank, later voluntarily re-appearing to answer further questions on December 11, 2006. [8] He never was in custody or its functional equivalent, and the right against self-incrimination therefore never attached.

### C. Ground Three: Failure of the prosecution to disclose favorable evidence

Petitioner's third ground makes two different claims. In the first sentence he accuses the government of failing to disclose evidence favorable to him. He fails to recite, however, what exculpatory or impeachment evidence the government failed to disclose to him. He simply makes a bald conclusory allegation without supporting facts, and such which will not support a § 2255 claim, *O'Malley, supra*. Further, in its response the government unequivocally stated that it disclosed all *Brady* and impeachment evidence far in advance of trial.

Petitioner next asserts his lawyers were ineffective for failing to use certain evidence: "This evidence was in my case file but not used because my attorneys did not study my case file that was given to them by my former attorney…." By "this evidence," petitioner suggests that "others were involved in this bank scam…."

Whether anyone beyond the three defendants was involved in the fraudulent scheme would have had no bearing on petitioner's guilt or innocence. Similarly, whether any bank official was negligent in approving the loan to Clark (which petitioner suggests in several of his exhibits to his motion) was irrelevant to the question of petitioner's guilt or innocence. Even if it be assumed others were involved in the scam or that the bank was negligent, and that his attorneys failed to attempt to so demonstrate, petitioner suffered no prejudice; indeed, if such evidence had been offered, this court would have sustained any objection thereto.

### D. Ground Four: Petitioner is actually innocent; his attorneys were ineffective for failing to object to the PSI and for failing to file a suppression motion

---

[7] Doc. 177 at 203-4; 229
[8] Doc. 186 at 7

7

First, Petitioner argues that he is actually innocent of the conspiracy charge because he was taken advantage of by others (presumably Clark, Rogers, and perhaps Forrester) whom he trusted, and he didn't read the various documents to which "swindlers" had signed his name. Other than his *ipse dixit* and claims of attorney ineffectiveness, he offers no evidence of his innocence.

Petitioner is asking this court to do what the district court mistakenly did in *Hodgson v. Warren*, 622 F.3d. 591 (6th. Cir. 2010):

> The district court reasoned that proof of a constitutional violation (here, ineffective assistance of counsel) can serve as a gateway for a freestanding claim of actual innocence. The law is actually the reverse: "[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."

*Id.* at 621.

Since petitioner is not raising a claim that is otherwise barred, his claim of actual innocence is "freestanding." If such a claim exists in *habeas* or §2255 jurisprudence, the burden of proof is *extraordinarily* high, *House v. Bell*, 547 U.S. 518 (2006), and petitioner has presented no evidence at all beyond his own assertion.

Second, Petitioner contends that his attorneys were ineffective for failing to object to the presentence report, and for failing to file a suppression motion. He does not recite what evidence was potentially subject to suppression, and this court can think of none. Failing to file meaningless objections or motions does not constitute ineffective representation since they could not have affected the outcome of the trial or petitioner's sentence, *Strickland, supra.* As for the claimed failure to object to the presentence report, his attorneys did so; they objected to the 14-level enhancement under USSG §2B1.1(b)(1)(H) based on the bank's loss, and to the 2-level enhancement under §2B1.1(b)(10)( C) for employing sophisticated means to defraud the bank. Those objections were the subject of a lengthy hearing on June 12, 2012. [9]

Finally, Petitioner's motion and the exhibits attached to it contain other arguments and claims which concern the weight and sufficiency of the evidence. Such claims are not reviewable in a §2255 motion, *Osborn v. United States,* 415 F.3d. 1021 (6th Cir. 1969), and there is no need to address them further.

---

[9] Doc. 174 at 2

## IV.   PETITIONER'S MOTION TO AMEND, DOC. 207

In a motion to amend his original motion, petitioner asks to raise an additional claim of ineffectiveness of counsel. To understand the motion, some additional background information is needed. The point of the fraudulently-inflated sales price for the properties sold by petitioner to Clark was to enable Clark to get some cash back at the loan closing so that he would have some "operating money" to get his newly-purchased businesses up and running. Understandably, the excess money privately earmarked for Clark's cash-back, $124,977, was included at closing in the bank's check to petitioner, much to Clark's chagrin. With the assistance of Rogers, Clark showed petitioner that he had received too much of the loan proceeds (as between them, of course), and Clark persuaded petitioner to repay $124,977 to him on the spot. [10]

Clark ultimately filed for bankruptcy, and petitioner filed an adversary proceeding in which he claimed that Clark basically cheated him out of the $124,977 which should not be discharged. After the hearing, United States Bankruptcy Judge Marcia Parsons found that Clark made misrepresentations to petitioner and therefore the $124,977 was non-dischargeable.

In his motion to amend, petitioner refers to the transcript of the hearing before Bankruptcy Judge Parsons[11] and says that his attorneys failed him because "nothing about Sam Clark's bankruptcy or Judge Parson's decision was shown to the twelve jury members."

The Bankruptcy Court judgment was the result of a proceeding that employed a lesser standard of proof, as well as being based upon far less evidence than that presented at the subsequent criminal trial. Introduction of the judgment could have had only one purpose: since Judge Parsons found that Clark deceived petitioner when he inveigled him to repay $124,977 of the loan proceeds to Clark, the jury should infer from that finding that Clark was not part of the underlying conspiracy to defraud the bank. Such an inference simply could not be drawn from Judge Parson's decision. Evidence of the bankruptcy judgment was not relevant and, even it was, its infinitesimally small probative value would have been far outweighed by the extreme likelihood of misleading and confusing the jury, Fed. Rule Evid. 403. Judge Parson's decision would not have been admissible in the criminal trial. Thus, petitioner's attorneys were not ineffective for failing to attempt to put the judgment into evidence.

---

[10] Doc. 111 at .20; 47; 59-60; 62; 64
[11] Doc. 207-1

The transcript of Clarks' testimony in the bankruptcy proceeding is another matter. Using it would have been proper if needed to impeach Clark during his testimony in the subsequent criminal proceeding. The court has read the transcript. Its potential use would have been more to show what Clark did not say as opposed to what he did say. Moreover, Clark testified that the second mortgage was a "dummy second mortgage that [petitioner] agreed to." He also described, albeit somewhat inartfully (he was not represented by an attorney), that the sales price was inflated. When petitioner testified before Judge Parsons, he, too, discussed the inflated sales price.

The transcript perhaps would have had some marginal value for impeachment, but not so much that it can be said that counsel's failure probably affected the outcome of the trial in light of all the evidence, including that supplied by petitioner himself. [12] Further, using the transcript could have had the anomalous effect (from petitioner's standpoint) of bolstering Clarks' testimony in the criminal trial. Counsel's failure to use the bankruptcy proceeding transcript cannot be second-guessed under the highly deferential standard. As a result, petitioner's motion to amend, [Doc. 207], is DENIED on the basis of futility.

## V. MOTION FOR EVIDENTIARY HEARING, DOC. 223

Petitioner's §2255 motion does not warrant an evidentiary hearing; the records of this case are sufficient to decide all claims he has raised. His motion for an evidentiary hearing, [Doc. 223], is DENIED.

## VI. CONCLUSION

Petitioner's motion to amend, [Doc. 207], is DENIED for the reasons earlier discussed.

Petitioner's claims are meritless and his motion to vacate, set aside or correct his sentence, [Doc. 205], is DENIED.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F. 3d 466 (6th Cir. 2001). The District Court must "engage

---

[12] *Viz.*, his statement to the FBI agents about Schedule C to his 2005 tax return and the recording of his phone conversation with Clark which he also gave to the FBI.

in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standard set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595 (2000). *Id*.

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." After reviewing Petitioner's claim, the Court finds that reasonable jurists could not conclude that petitioner's claim is adequate to deserve further review. Because petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.

A separate judgment will be filed in accordance with this Memorandum and Order.

SO ORDERED.

ENTER:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE